UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 SEP 10  AM 11: 14



BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| DEAN CORREN, the | * | CASE NO. 2:15-cv-58 |
| VERMONT PROGRESSIVE | * | |
| PARTY, STEVEN HINGTGEN, | * | |
| RICHARD KEMP, and | * | |
| MARJORIE POWER, | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | |
| | * | |
| WILLIAM SORRELL, | * | |
| Vermont Attorney General, | * | |
| in his official capacity, | * | |
| Defendant | * | |

**SECOND AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL CIVIL RIGHTS ACT**

**PARTIES**

1)      Dean Corren is a resident of Burlington, Vermont. In 2014 he unsuccessfully ran for the office of Vermont Lieutenant Governor as the nominee of both the plaintiff Vermont Progressive Party (VPP) and of the Vermont Democratic Party (VDP), having won the primary election of each.

2)      The VPP is a major Vermont political party.

3)      Steven Hingtgen is a resident of Montpelier.  He currently serves on the Montpelier School Board, was formerly a member of the Vermont House of Representatives from the City of Burlington, is a former Commissioner of the Burlington Electric Department, was a publicly financed candidate of the VPP for Lt. Governor, and has been a contributor to Progressive and other candidates.

4)      Richard Kemp of Burlington is a former member of the Burlington City Council, has been a former candidate of the VPP for Lt. Governor, and has been a contributor to

Progressive and other candidates.

5)      Marjorie Power is an attorney residing in Montpelier. She has been a former Vermont Public Service Board Hearing Examiner, has been a VPP candidate for Lt. Governor, and has been a contributor to Progressive candidates.

6)      Defendant William Sorrell is Vermont Attorney General, charged with the enforcement of Vermont's election campaign finance laws.

## JURISDICTION

7)      This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), including but not limited to ancillary jurisdiction, and supplemental jurisdiction over questions of state law under 28 U.S.C. § 1367.

## FACTS

8)      Pursuant to 17 V.S.A. Chapter 61, subchapter 5, called the *Vermont Campaign Finance Option*, a candidate for the office of Lt. Governor who raises at least $17,500 from not fewer than 750 individuals who each make a contribution that does not exceed $50.00 will qualify to receive campaign finance grants in amounts up to $32,500 for the primary election period, and $150,000 during the general election period.

9)      Mr. Corren qualified for and received public campaign funds under the *Option* for both the 2014 primary and general election periods.

10)     During the course of the campaign, on or about October 27, 2014 Mr. Sorrell's office received a complaint of a violation of 17 V.S.A. § 2853(b) which prohibits candidates who accept Vermont campaign finance grants (hereinafter "publicly funded candidates" or "PFCs") from soliciting, accepting, or expending any in-kind contributions.

2

11)     Specifically it was alleged that a mass mailing called an "email blast" disseminated by the VDP on or about October 24, 2014 which Mr. Sorrell valued at $255 constituted an uncompensated in-kind contribution to Mr. Corren which is prohibited by 17 V.S.A. § 2853(b)(1).

12)     This was communicated by Mr. Sorrell to Mr. Corren's campaign in a formal "notice of alleged violation" served on or about October 30, 2014.

13)     Mr. Corren disputed and the plaintiffs all dispute that this email was an in-kind campaign contribution because it was not a coordinated communication and is excluded from the definition of "contribution" by 17 V.S.A. § 2901(4).

14)     Shortly after being informed of the alleged violation, Mr. Corren offered alternatively that he would moot out any case or controversy whether it was an in-kind contribution by simply paying for it out of his Vermont campaign funds, and offered to put a portion into escrow for that purpose.

15)     This option was rejected by Mr. Sorrell.

**A $72,000 Fine for a $255 Email.**

16)     Mr. Sorrell later threatened Mr. Corren with enforcement action under 17 V.S.A. § 2903(b) if he did not, among other things, agree to pay to the State of Vermont some $72,000: $52,000 for the unspent balance of his campaign finance grant he claimed existed at the time of the alleged violation, plus $20,000 in fines for soliciting the in-kind contribution, for violation of the cap set by §2983(b)(1), and for failing to report a contribution as required by 17 V.S.A. §2963(a)(1), prompting the filing of this action on March 20, 2015. After this action was commenced, Mr. Sorrell filed an enforcement action against Mr. Corren in the Vermont Superior Court on March 25, 2015.

## THE SPECIFICS OF THE PARTIES' STANDING
## TO PROSECUTE THE CLAIMS

17)     Parties which seek to invoke the court's authority must "show that s/he personally

has suffered some actual or threatened injury as a result of the putatively illegal conduct

of the defendant." *Landell v. Sorrell*, 118 F. Supp. 2d. 459 (D. Vt. 2000).

**Actual Constitutional Injury in 2014, 2015, and Prospective Injury in 2015-16 and
Beyond.**

**Actual and Threatened Enforcement by Mr. Sorrell in 2015.**

18)     In 2015 Mr. Sorrell threatened to investigate the VPP if Mr. Corren did not pay

$72,000 in fines for the email blast accusation. Therefore both Mr. Corren and VPP have

the distinction of having been the victims of an actual enforcement threat in 2015. Absent

a grant of declaratory and injunctive relief, this is having and will have a chilling effect

amounting to a de facto prior restraint under *Citizens United v. FEC*, 558 U.S. 310, 333-

36 (2010) whose harm is capable of repetition yet evading review, *Roe v. Wade*, 410 U.S.

113, 124 (1973); *Davis v. FEC*, 554 U.S. 724, 734-35 (2008).

19)     All the parties have standing because they suffered actual constitutional injury in

2014 traceable to the statute, constitutional injury that goes well beyond the mass mailing

"email blast" enforcement taken against Mr. Corren.

**VPP Has Standing as a Political Party.**

20)     The VPP supports candidates for office by raising money and providing in-kind

resources to its candidates. Because of its interest in carrying out a support for Vermont

political candidates in the future, including publicly financed candidates (PFCs), it has

4

standing to challenge the provisions of the Vermont Campaign Finance Act and of the Attorney General's enforcement position which limit its ability to do so. *Landell, supra* at 476. Absent grant of declaratory and injunctive relief, the harm it complains of here is capable of repetition but evading review.

### Self-Censorship in 2014 by the VPP and Mr. Corren, and in the Future.

21)     The danger of the statute and the Attorney General's enforcement position is in large measure one of self-censorship, a harm that can be realized without actual prosecution, functioning as a de facto form of prior restraint. *Citizens United, supra,* at 335-36; *Vermont Right to Life v. Sorrell,* 875 F.Supp.2d 376, 386 (D. Vt. 2002); *Vermont Right to Life v. Sorrell,* 221 F.3d 376 (2nd Cir. 2000) ["*VRL I*"].

22)     The VPP engages in many coordinated and collective political activities with its traditionally financed candidates (TFCs), including those activities enumerated in *Randall v. Sorrell,* 548 U.S. 230 at 257 (2006).

23)     They include providing the party platform and position papers which the candidates can use; helping maintain platform coherence; developing and coordinating methods of "messaging" which will best promote particular candidacies; designing and printing literature and lawn signs; providing literature templates with party colors, font and logos which are consistent with and promote the party "brand"; dealing and negotiating layout and content with printers so that the candidate need only worry about paying for the literature; arranging bulk ordering package literature and lawn signs deals for candidates; coordination of location identification, distributional logistics, and display of yard signs; providing training to candidates and volunteers how to campaign; developing calendars and timelines; arranging and coordinating candidate literature

displays and tables at state fairs and public events; coordination of identification and promotion of joint events with other candidates, of debates, and of candidate forums; scheduling candidates and volunteers for "honk and wave visibility" campaigning along highways; developing volunteer and donor lists; support with surveys and letters; coordinating letters to the editor campaigns in support of candidates; coordinating rapid response action by supporters in emails, twitter, and Facebook to respond to political attacks by opponents and PACs; coordinating conference calls with other candidates; voter identification training of candidates and volunteers; data entry training; mass mailings, especially with email, to promote support of, contributions to, and volunteering for, party candidates; use of developed mailing lists and voter identification, creation of voter and turnout lists, creation of lists of likely voters, and sympathetic likely voters who are "supporters and leaners"; arranging GOTV (Get Out The Vote) efforts such as phone banking, scheduling candidates and volunteers for election day "visibility" at polls; and helping coordinate ride-to the polls efforts.

24) Because Mr. Corren's 2014 campaign was publicly financed, out of fear of running afoul of a claim of a prohibited in-kind contribution under 17 V.S.A. §§2944 and 2983(b)(1), both the VPP and Mr. Corren extensively self-censored, erecting a communication barrier between VPP and his campaign, engaging in only in compensated coordinated or collective political activity such Mr. Corren's rental of use of VPP mailing lists and a jointly funded table at the 2015 gay pride parade in Burlington, and no uncompensated coordinated or collective political activity.

25) This prompted some VPP supporters to criticize the Party officials for not more actively supporting his campaign and for giving the impression that its support for him

6

was lukewarm or it was not really supporting him at all.

26)     Sections 2944 and 2983(b)(1) allow coordinated or collective political action by a PFC and his/her political party only on a fee-for-service basis. The resulting self-censorship of any non-monetized collective or coordinated action constituted and constitute ongoing injury to the protected First Amendment associational rights of both Mr. Corren and VPP in 2014.

27)     Absent declaratory and injunctive relief now, the chilling effects created by these statutes and Attorney General's enforcement position will result in a continuation of that self-censorship by both the VPP and any of its PFCs who run in the 2015-16 election cycle or in the future, and by others similarly situated. This self-censorship is a constitutional injury capable of repetition yet evading review.

28)     Like the plaintiffs in *McCutcheon v. FEC*, 572 U.S. ___; 134 S.Ct. 1434 (2014), and *Davis, supra*, the VPP and Mr. Corren decline to play the self-censorship game anymore or allow such repetition.

29)     They instead now challenge the constitutionality of the regime. *McCutcheon, supra.* [plaintiff and Republican National Committee self-censored by limiting past campaign contributions, but was no longer willing to do so].

**Standing of Individual Plaintiffs as Contributors.**

30)     "(T)he First Amendment safeguards an individual's right to participate in the public debate through political expression and association. When an individual contributes money to a candidate, he exercises both of these rights." *McCutcheon* at 1448.

31)     The individual plaintiffs each have been contributors to the VPP and to individual

7

candidates, and therefore each has standing as a contributor. *McCutcheon, supra; Oxfeld v. Sorrell*, No. 2:08 cv 174 (D.Vt. 2008); *Landell, supra* at 474-76.

### Standing As Small Contributors to the VPP.

32)     The VPP relies on small contributions from members.

33)     In 2014 its contributions averaged $43.34, and unlike the VDP and the Vermont Republican Party, has no national party resources to draw upon.

34)     The individual plaintiffs each have been contributors of small amounts to the VPP.

35)     Both Ms. Power and Mr. Corren have been giving VPP a small monthly donation.

36)     Their contributions were made with the expectation that the Party use the money to best advance its ideals and interests, and help elect whichever party candidates the party believes would be best suited to do so.

37)     The flat prohibition on party contributions to PFCs in 2014 created by §§2944 and 2983(b)(1) violated *Randall* 257-58, unconstitutionally restricting their First Amendment right to engage in coordinated and collective political activity by preventing VPP from using their contributions as small donors to the Party to provide assistance to Mr. Corren in 2014.

38)     Absent declaratory and injunctive relief, this prohibition is a constitutional harm capable of repetition but evading review, and they will be denied that right as to future PFC's.

### Constitutional Injury from Mandatory Under-Resourcing of Mr. Corren's 2014 Campaign and Under-Resourcing in the Future of PFCs Who Are Outspent/Outraised by Competing TFCs.

39)     A restriction on the amount of money a person can spend on political

8

communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. *Buckley v. Valeo,* 424 U.S. 1, 19 (1976).

40)     Even where a person has no "right" to a governmental benefit, the state cannot grant or withhold a benefit on the condition that s/he waive his/or interest in free speech, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), unless it is justified by a compelling state interest. *Republican National Committee v. FEC*, 487 F. Supp. 280, 284-85 (S.D.N.Y. 1980).

41)     Because it does not allow for additional private "trigger" or "rescue" fundraising when a PFC is being outspent and/or outraised by a TFC opponent, the fixed contribution and expenditure cap of 17 V.S.A. § 2983(b)(1) restricted Mr. Corren's political speech in the 2014 election while serving neither a compelling state interest, a significant governmental interest, or doing either in a manner that was narrowly tailored. Unless declaratory and injunctive relief is granted here, the cap will continue to do so in the future for any PFC being so outspent, including any of the plaintiffs should they decide to run again, and will therefore create constitutional harm capable of repetition, yet evading review.

### Violation of Ms. Power's Rights in 2014 as a Contributor to Mr. Corren and of His Own Right to Self-Finance.

42)     Ms. Power made a maximum $50 qualifying campaign contribution in 2014 to Mr. Corren.

43)     When she was a previous VPP candidate for Lt. Governor, she ran against the Republican candidate Phil Scott, who is now the incumbent Lt. Governor who ran against

9

Mr. Corren in 2014.

44)     During that campaign with her, Mr. Scott had said to Ms. Power that he would spend whatever it would take to get elected to the seat.  She therefore was cognizant that Mr. Scott would outraise and outspend the $200 thousand allowed to Mr. Corren under 17 V.S.A. § 2983.

45)     Mr. Scott in fact raised $295,245.50 in the 2014 campaign.

46)     Were it not for the flat prohibition against solicitation, receipt and expenditure of any additional funds by 17 V.S.A. §2983(b)(1), Ms. Power would have made a supplemental contribution to Mr. Corren's 2014 campaign once campaign finance reports showed he was being outspent/outraised by Mr. Scott.

47)     Mr. Corren was similarly unconstitutionally denied any opportunity to make a supplemental contribution to his own campaign. *Davis v. FEC, supra.*

48)     Ms. Power and Mr. Corren therefore suffered a constitutional injury in 2014 and have standing to challenge §2983(b)(1).

49)     Ms. Power and Mr. Corren would in the future like to exercise the right to make a supplemental private contribution to PFCs in situations where they are being outraised and/or out spent by TFCs. *McCutcheon* and *Davis, supra.*

50)     Absent declaratory and injunctive relief, theirs is a constitutional harm capable of repetition, yet evading review, and they will be denied that ability to exercise that right as to future PFCs.

**The Chilling Effect of All This on Candidate Recruitment.**

51)     The VPP's platform supports public financing for all elected offices.

52)     The VPP, and each of the individual plaintiffs as VPP party activists, therefore

10

have an associational interest in recruiting Progressive PFCs, and in so doing without the unconstitutional limitations imposed by the statute and/or the Attorney General's enforcement position.

53)     The enforcement position of the Vermont Attorney General evidenced by the actions made and threatened here, combined with the challenged provisions of the statute, hang over those efforts like the Sword of Damocles, constituting a significant threat to and chilling effect on the electoral process and to First Amendment rights of association and speech, including those of the plaintiffs, and constructively create a prior restraint presently and in the future.

54)     The current election cycle is now in full swing.  As of the date of this writing there are already five formally announced 2016 election candidates for the office of Governor and one for the office of Lt. Governor.

55)     Absent declaratory and injunctive relief, self-censorship will be the only effective alternative option for PFCs if they want to avoid the threat of an enforcement action.

56)     Absent declaratory and injunctive relief, some prospective PFCs will fear that no amount of self-censorship will suffice, and that risks of prosecution after accepting public financing will be too great. Even with best efforts to self-censor, there is the possibility of a PFC or campaign staffer inadvertently or unintentionally triggering a campaign finance tripwire which violates the expenditure and contribution cap and thereby triggering financial liability for the candidate under the statute, to say nothing of politically motivated or misguided or bad faith enforcement actions by the Attorney General. They will decline the public financing option altogether.

11

57)     Other potential PFCs are concerned that absent this declaratory and injunctive relief, PFCs will also have to remain institutionally under-resourced when competing TFCs who outraise/outspend them given the limited resources allowed by the rigid spending and resources cap of §2983(b)(1), and may be forced to decline public financing for that reason.

58)     Separately and combined, this creates a chilling recruitment of PFCs by the VPP. *Landell, supra* at 475-76 [plaintiffs Vermont Libertarian Party and Vermont Republican State Committee had standing because they intended to carry out their supporting role for Vermont political candidates that year and into the future; Steve Howard who formerly held elective office had standing because he refrained from running because of the resource limitations imposed by the Campaign Finance Act].

### Chilling Effect on Mr. Corren's Specific Plans

59)     Because Lt. Governor Scott has now announced his candidacy for Governor and leaves an open seat, Mr. Corren would stand a reasonable chance of being elected to it in 2016 having already run a statewide race for the seat.

60)     No candidate seeking public financing can announce his/her candidacy until February 15, 2016 at the earliest because 17 V.S.A. §2983(a) will render ineligible for 2016 public financing any candidate who announces his/her candidacy prior to that date.

61)     Mr. Corren is actively considering running a publicly financed candidacy again for Lt. Governor and in August of 2015 publicly expressed his interest doing so, but cannot publicly state any such decision until February 15, 2016.

62)     He has stated publicly to both *VT Digger* and the *Rutland Herald* in August of 2015 that he will not do so unless the issues raised by this case are resolved in time.

12

*Landell, supra.*

**Overbreadth Standing**

63)     Because the 19 V.S.A. § 2983(b)(1) is not narrowly tailored, it is overbroad.

64)     The overbreadth doctrine would allow a challenge even if the parties' own conduct was not affected because there is a realistic danger that the statute and/or the Attorney General's enforcement policy will have an overall deterrent effect on free expression and significantly compromise recognized First Amendment protections of parties not before the court. This exception is predicated on a judicial predilection or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

65)     Plaintiffs therefore additionally also have overbreadth standing to challenge the chilling effects of the statute and the Attorney General's enforcement position.

## THE DECLARATORY AND INJUNCTIVE RELIEF REQUESTED

## COUNT I – DECLARATORY JUDGMENT OF THE UNCONSTITUTIONALITY OF 17 V.S.A. §2983(b)(1)

66)     The previous paragraphs are restated.

67)     The cap of 17 V.S.A. § 2983(b)(1) makes it unlawful for a PFC to thereafter (i) solicit, accept, or expend any campaign contribution or (ii) to make any expenditures not covered by the grant and the front-end qualifying fundraising. This prohibition includes "related campaign expenditures" by political parties under 17 V.S.A. § 2944.

68)     Plaintiffs seek a declaratory judgment under the federal Civil Rights Act, 42 U.S.C. § 1983 that the contribution/expenditure cap created by 17 V.S.A. §§2944 and 2983(b)(1) was and is unconstitutional in three respects.

### The Specific Enforcement Action against Mr. Corren Violated the Declaratory Judgment Issued in *Randall v. Sorrell* which is *Res Judicata.*

69)    The U.S. Supreme Court issued a declaratory judgment in the case of *Randall v Sorrell* in which defendant Sorrell here was the party defendant there.

70)    The judgment in that case was on remand entered in this court on September 26, 2007.

71)    *Randall's* declaratory judgment specifically held that the State of Vermont could not constitutionally prohibit political party donations to candidates if they were less than $400 because this "would severely limit the ability of a party to assist its candidates' campaigns by engaging in coordinated spending on advertising, candidate events, voter lists, *mass mailings*, even yard signs," would reduce the voice of  political parties in Vermont "to a whisper," and therefore unconstitutionally interfered with First Amendment rights of association (emphasis added).

72)    Section 2983(b)(1) prohibits party contributions to PFCs altogether. The alleged in-kind party contribution represented by the VDP email mass mailing in question here is alleged to have been worth $255.

73)    Mr. Sorrell is in violation of this declaratory judgment and his enforcement action against Mr. Corren is barred by issue and/ or claim preclusion, including collateral estoppel.

### The Cap of §2983(b)(1) is An Unconstitutional Restriction on PFCs' Rights to Engage in Collective Activities and to Associate with Political Parties.

74)    The flat prohibition of § 2983(b)(1) on party contributions to PFCs eliminates even any "whisper" of a party voice in PFC campaigns, amounting to a de facto gag order in violation of *Citizens United.*

14

75)     The cap of §2983(b)(1) unnecessarily, unfairly, and disproportionately restricted, restricts, and chills the right of PFC's to associate with their political parties, to receive party assistance, to participate in party sponsored advertising, to engage in coordinated activities, to engage in collective political activity, and it muzzled and muzzles the voice of political parties as far as PFCs were and are concerned.

76)     This is aggravated by the fact that in 2014 the Vermont Campaign Finance Act was amended at 17 V.S.A. § 2941(a)(3)(B) to provide that starting in 2015, TFCs can receive unlimited contributions from political parties.

77)     The cap of §2983(b)(1) violated and violates the First Amendment because it is not supported by any compelling and/or significant state interest, and/or is not narrowly tailored.

### The Lack of Any Rescue, Trigger, or Waiver Provisions in §2983(b)(1).

78)     The *Vermont Campaign Finance Option* is a "lump sum grant" system which distributes a public financing grant at the beginning of the primary and then another at the beginning of the general election cycle.

79)     The dynamic nature of the electoral system makes *ex ante* predictions about setting competitive lump-sum grant levels almost impossible.

80)     If the lump sum grant is pegged too low, it puts the PFCs at a disadvantage because they lack any means to respond if they are out-raised or out-spent by their TFC opponents.

81)     The Vermont *Option* not only allows, but requires, a certain level of private contributions to qualify. Nevertheless, once a candidate qualifies, the Vermont system lacks any adaptive mechanisms such as "trigger" or "rescue" provisions of the kind

15

approved by the 8th Circuit in Minnesota in *Rosensteil v. Rodrizuez*, 101 F.3d 1554, 1546-47 (1995) and in New York City by the Second Circuit in *Ognibene v. Parkes*, 671 F.3d 174, 204-06 (2011) which adjust the private campaign contribution and the expenditure cap to achieve a "Goldilocks solution" allowing the PFC to privately raise additional funds when outraised or outspent by a TFC.

82)     According to the campaign finance reports filed with the Vermont Secretary of State, Mr. Corren's 2014 incumbent TFC Republican opponent Mr. Phil Scott raised $295,246 compared to the $200,000 in total resources available to Mr. Corren as a PFC.

83)     The fixed cap of §2983(b)(1) furthered and furthers no compelling or sufficiently important governmental interest, was and is not narrowly tailored and/or closely drawn, and unfairly and unnecessarily burdened and burdens the competitive political opportunity of PFCs.

84)     Instead, this cap undermined and undermines the recognized "sufficiently important governmental interests" behind public campaign financing – to reduce the appearance of and actual *quid quo pro* corruption – by chilling candidate participation in public financing, and reducing the number of candidates who will choose public financing.

85)     Absent declaratory and injunctive relief under 42 U.S.C. §1983 striking §2983(b)(1) as unconstitutional, it creates a condition of constitutional harm capable of repetition but evading review.

## COUNT II – DECLARATORY JUDGMENT OF THE
## UNCONSTITUTIONALITY OF 17 V.S.A. §2944(c)(1) and (2)

86)     The previous paragraphs are restated.

87)   The provisions of §2944(c)(1) and (2) concern whether a party expenditure or activity will be considered a related campaign expenditure by a candidate based on whether it "primarily benefits six or fewer candidates" or "substantially benefits more than six candidates."

### Violating Rights of Association

88)   Because limits on expenditure by parties for TFCs have been eliminated, §2944(b)(1) and (2) now at most simply trigger a contribution reporting requirement.

89)   But because of the ban of §2983(b)(1) and (2) on any and all "contributions," §2944(b)(1) and (2) effectuate an absolute ban on PFC/party association.

90)   There is nothing about the purported six candidate demarcation line which is constitutionally significant and which makes the prohibition any less a violation of PFCs' rights to associate with their party.  Under *Randall*, §2944(b)(1) and (2) violate the rights of political association of PFCs and their parties irrespective whether six or more candidates are involved or benefitted by the party activity in question.

### Unconstitutional Ambiguity

91)   While the decision to speak must be made on the spot, "in the heat of political campaigns," under *Citizens United* such "open ended rough and tumble factors" invite uncertainty, fail to give a person of ordinary intelligence a clear standard of the prescribed conduct, and invite arbitrary and capricious enforcement.

92)   Subsections 2944(b)(1) and (2) are therefore unconstitutionally ambiguous. Absent grant of declaratory relief under §1983, because of the consequences to PFCs under the ban of §2983(b)(1), and the chilling effect resulting from the ambiguity, they are a form of prior restraint of coordinated and collective political communication

17

between PFCs and their political party.

## COUNT III–
## DECLARATORY JUDGMENT THAT THE VDP EMAIL BLAST
## WAS NOT A "CONTRIBUTION"

93)     The previous paragraphs are restated.

94)     After *Randall v Sorrell* struck the statutory cap on Vermont political party campaign contributions to candidates, the Vermont Legislature did not come to agreement on amendments to the statute until 2014.

95)     Paragraph 10 of the 2014 legislative findings in the session law state

> 10)     Exempting certain activities of political parties from the definition of what constitutes a contribution is important so as not to overly burden collective political activity. Those activities, such as using the assistance of volunteers, preparing candidate listings, and hosting certain campaign events, are part of a party's traditional role in assisting candidates to run for office. Moreover, these exemptions help protect the right to associate in a political party.

96)     The definition of "contribution" was therefore amended by 17 V.S.A. §2901(4) to exclude certain in-kind activities of political parties:

> As used in this chapter, "contribution" shall not include any of the following...
>
> (F) the use of a political party's offices, telephones, computers, and similar equipment...

97)     The VDP's October 24th "email blast" was sent out by the VDP on its computer system, and therefore fits within the exclusion from the definition of "contribution" under subsection F.

98)     In addition the October 24, 2014 email blast invited the readers to attend one of a series of four campaign events to be held over the weekend of October 25-26[th], each of which was attended by at least three candidates.

99)     Therefore the VDP email blast was also an expenditure "by a political party in

18

connection with a campaign event at which three or more candidates are present" and thereby excluded from the definition of "contribution" by 17 V.S.A. § 2901(4)(L).

100)    Despite these clear exclusions of certain party activities from the definition of "contribution," the Attorney General's enforcement position is that party activities such as the email blast remain a form of in-kind contribution, that discussions about such support by a candidate with his/her political party constitute "solicitation" of such contribution, and that failure to report such activity as a contribution is a violation of reporting requirements by both the candidate and the party.

101)    For TFCs for whom party contributions are unlimited, the enforcement position of the Attorney General to ignore these exclusions from the definition of "contribution" found in §2901(4) creates only a possible contribution reporting requirement. But because of §2983(b)(1) and (2)'s ban on any "contributions," for PFCs it operates unconstitutionally as a complete ban on any collective party/candidate interaction.

102)    It also puts political parties such as the VPP at risk of being prosecuted for failure to report these party activities as "contributions" under 17 V.S.A. §§2963(a)(3)(a), 2964. The VDP capitulated to that very threat here.

103)    The arbitrary and capricious refusal of the Attorney General to honor these statutory exclusions therefore creates a chilling effect and prior restraint upon on the speech and associational rights of PFCs, candidates considering public financing, and their political parties, and their parties' members, including plaintiffs, and creates harm capable of repetition but evading review.

104)    The plaintiffs therefore ask the Court pursuant to 42 U.S.C. § 1983 and its supplemental jurisdiction and 28 U.S.C. § 2201(a) to issue a declaratory judgment that

19

political party activities enumerated in §2901(4), including the VDP the email blast in question, are not "in-kind contributions," could not be the subject of a solicitation of an illegal contribution, and need not have been or be reported as a campaign contribution.

## COUNT IV-
## THE UNCONSTITUTIONALITY OF THE "REFUND" PROVISION OF FORMER §2903(b).

105)    The previous paragraphs are restated.

106)    Mr. Sorrell seeks enforcement against Mr. Corren of the "refund" provision of 17 V.S.A. §2903(b) which prior to its subsequent amendment in 2015 required that "A person who violates any provision of this chapter...shall refund the unspent balance of the Vermont campaign finance grant received under subchapter 5 of this chapter which existed as of the date of the violation," which Mr. Sorrell claims in Mr. Corren's case was some $52,000 as of October 24, 2014.

107)    The statute's use of the term "refund" is a fiction because any such grant "balance" existing at the time of an alleged violation has either long since either (i) been spent on the campaign, or (ii) returned to the State at the end of the election cycle as required by 17 V.S.A. § 2983(b)(3).

108)    This was the case for Mr. Corren who expended all of his campaign grant except for $73.60 which was returned to the State on December 12, 2014.

109)    This is a double penalty in addition to the $10,000 civil fines also provided by §2903(b). There is no comparable double penalty for campaign act violations for TFCs, political parties, or political action committees.

### The Calculation of the Amount Due Is Not Rationally Related

110)    Under the statute, a PFC who make an innocent or minimal violation early in the

20

election cycle before a large portion of his/her grant has been expended must forfeit all such unexpended portion, which on the other hand a PFC who commits a large and even a willful one after s/he has expended all her grant owes nothing at all.

111)   This is not rationally related and violates the 14th amendment.

**The Statute Is Not Narrowly Tailored.**

112)   The possibility of a large double fine or penalty which is owed only by PFCs does not serve a compelling and/or sufficiently important state interest given the recognized legitimate governmental interest behind public election financing, and/or does not do so by means that are narrowly tailored and/or closely drawn.

113)   It was not narrowly tailored because there exist less punitive alternatives that are equally effective in advancing the State's interests, such as the amendment adopted by the Vermont Legislature in 2015.

114)   It also lacks narrow tailoring because it is mandatory, it lacks any good faith defense to liability, it lacks any provisions for opportunity to cure, it makes no distinction between intended and unintended violations when apportioning the fine, and it had no provision for simple restitution of the amount of the violation such as are present in the federal Presidential Election Campaign Fund.

**Violation of the 8th Amendment Prohibition against Excessive Fines**

115)   A payment under §2903(b) is a payment of a fine for purposes of the Excessive Fines Clause, and a payment such as of $52,000 claimed by the Attorney General in Mr. Corren's case is grossly excessive and disproportional to the gravity of any offense and violates the Eight Amendment.

**Alternatively, the Statute Is A Form of Excessive Punitive Damage Which**

21

**Violates the Due Process Clause.**

116) Alternatively, the provision of §2903(b) is an excessive form of punitive damages against a PFC personally which violates 14th Amendment Due Process.

## RELIEF REQUESTED

117) All the plaintiffs seek declaratory judgment and preliminary and permanent injunctive relief under 42 U.S.C. § 1983 against any enforcement or threatened enforcement of 17 V.S.A. § 2944(c)(1) and (2) and of §2983(b)(1) with respect to political parties, including the declaratory judgment concerning the applicability of the exclusions of §2901(4)(F) and (L), as discussed herein.

118) Mr. Corren seeks declaratory judgment that the "refund" provision of former §2903(b) is unconstitutional, and a preliminary and permanent injunction against its enforcement.

119) In addition they all seek an award of reasonable attorneys' fees and litigation costs under 42 U.S.C. § 1988, and any other relief which is just, reasonable, or necessary.

Dated at Burlington, Vermont this 10th day of September, 2015.

John L. Franco, Jr., Esq.
110 Main Street
Burlington, Vermont
(802) 864-7207
johnfrancolaw @aol.com
Attorney for Plaintiffs

22