UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DEAN CORREN, the VERMONT      :
PROGRESSIVE PARTY, STEVEN     :
HINGTGEN, RICHARD KEMP,       :
and MARJORIE POWER,           :
                              :
     Plaintiffs,              :
                              :
DAVID ZUCKERMAN,              :
                              :
     Intervenor/Plaintiff,    :
                              :
          v.                  :    Case No. 2:15-cv-58
                              :
WILLIAM SORRELL, Vermont      :
Attorney General in his       :
official capacity, and        :
JAMES CONDOS, Vermont         :
Secretary of State in his     :
official capacity,            :
                              :
     Defendants.              :

## OPINION AND ORDER

Plaintiffs are challenging the constitutionality of Vermont's campaign finance law as it pertains to publicly-financed candidates.  In a related case, the Vermont Attorney General's office has brought an enforcement action against Plaintiff Dean Corren alleging campaign finance law violations.  That case is ongoing in state court.  Currently pending in this Court are Plaintiffs' motion for preliminary injunctive relief and Defendants' motion to dismiss.  For the reasons set forth below, the motion for preliminary injunctive relief is **denied**, the motion to dismiss is **granted**, and the case is **dismissed** without prejudice to refiling.

Briefly stated, the Court finds no constitutional infirmity with the Vermont statute so long as it is construed as allowing supporters to associate and communicate with publicly-funded candidates consistent with the intent of the Vermont Legislature. If the state courts construe the law in a way that significantly restricts those communications, Plaintiffs may re-file their objections so that this Court can revisit the constitutionality of the entire public financing scheme.

**Factual Background**

**I.    Public Financing In Vermont**

Since 1997, Vermont has offered political candidates the option of financing their campaigns with public funds.  To be eligible for such funding, candidates must first raise a certain amount in qualifying contributions.  If they are able to meet the qualifying threshold, candidates may then receive public funds in amounts fixed by the Legislature.

A publicly-funded candidate must abide by certain restrictions.  Generally speaking, those restrictions fall into four categories: (1) contribution limits; (2) spending limits; (3) related expenditures; and (4) the time period during which candidates may raise qualifying funds.  All of these provisions are anchored in a legitimate governmental concern.  Because public financing is premised upon the desire to avoid the potentially-corrupting influence of private donations, limits on

private contributions are a centerpiece of any such legislation.
Spending beyond the funding grant is also a fundamental
restriction.  The related expenditures limitation forbids certain
coordinated efforts between candidates and supporters that might
undermine the contribution and spending limitations.  Finally,
the qualifying period requires candidates to wait until a certain
date (in the 2016 election year, that date was February 15) to
announce their intention to use public funds and begin soliciting
qualifying contributions.  Defendants contend that this
restriction is necessary to ensure that only viable candidates
receive public money.

A broad reading of the public financing law, including the
limited restrictions, reveals the Legislature's effort to protect
the rights of supporters to speak and associate freely with
publicly-funded candidates.  For example, while publicly-funded
candidates are not allowed to accept private contributions beyond
the initial qualifying funds, *see* 17 V.S.A. § 2983(b)(1), the
term "contribution" has numerous exemptions.  Specifically, the
statute exempts volunteer activities; the use of political party
offices, telephones, computers and similar equipment; access to
party voter lists and voter identification information; campaign
training sessions if three or more candidates are present;
political party payment for an event attended by three or more
candidates; and party efforts to encourage voters to register

3

and/or vote so long as a specific candidate's name is not
mentioned.  17 V.S.A. § 2901(4).  The legislative findings
highlight the constitutional significance of these exemptions:

> Exempting certain activities of political parties from
> the definition of what constitutes a contribution is
> important so as not to overly burden collective
> political activity.  Those activities, such as using
> the assistance of volunteers, preparing candidate
> listings, and hosting certain campaign events, are part
> of a party's traditional role in assisting candidates
> to run for office.  Moreover, these exemptions help
> protect the right to associate in a political party.

Vt. Act 90, S.82, Sec. 1, ¶ 10.

A fundamental issue in this case is the relationship between
the exemptions in Section 2901(4) and the scope of the term
"contribution" elsewhere in the public financing statute.  For
example, an expenditure by a third party on behalf of a candidate
is considered a "contribution" if the expenditure is
"intentionally facilitated by, solicited by or approved by" the
candidate or the candidate's campaign committee.  17 V.S.A. §§
2944(a), (b).  If a publicly-funded candidate were to solicit or
accept such a "contribution," that might be considered a
violation of the candidate's pledge to accept only qualifying and
public funds.  *See* 17 V.S.A. § 2983(b)(1).  However, if the
exemptions in Section 2901(4) apply to Sections 2944 and
2983(b)(1), there would be no "contribution" and thus no
violation.

Defendants' briefing concedes that the exemptions in Section

2901(4) apply to "in-kind" contributions.  *See* ECF No. 43-1 at
27.  Plaintiffs maintain that the Attorney General's enforcement
actions are inconsistent with this concession.  *See* ECF No. 48 at
10-11.  Plaintiff Dean Corren testified that he was told by the
Attorney General's office that he had "no right to communicate
with the Democratic Party whatsoever," and that as a result he
did not "dare pick up the phone" to speak with party officials.
ECF No. 55 at 18-20.  Other hearing testimony revealed that
campaign workers were similarly wary of communicating with
supporters for fear of committing a statutory violation.
Accordingly, Plaintiffs seek a ruling as to the extent of the
Section 2901(4) exemptions.  ECF No. 48 at 10-11.

## II.  The Enforcement Action Against Dean Corren

In 2014, Dean Corren ran for office as a publicly-financed
candidate for Lieutenant Governor.  Corren was eligible to
receive public financing if he first raised at least $17,500 from
not fewer than 750 individuals, with each contribution not to
exceed $50.  17 V.S.A. § 2984(a)(2).  In raising this initial
sum, Corren was allowed spend up to $2,000 of his own money or
private contributions as seed money, and qualifying contributions
thereafter.  *Id.* § 2983(a).  The public financing grants then
offered up to $32,500 for the primary election period and
$150,000 during the general election period, amounting to a
potential total of $200,000 in campaign funds.  *Id.* § 2985(b)(2).

Corren qualified for public financing for both the primary and
the general elections, and received over $180,000 in campaign
finance grants.

While the Corren campaign was under way, the Vermont
Attorney General's office received a complaint that the campaign
had accepted an unlawful, in-kind contribution in the form of an
October 24, 2014 email sent by the Vermont Democratic Party
("VDP").  The email was sent by Dottie Deans, chair of the VDP,
and was entitled "How you can help me help Dean Corren."  A
Corren staff member had sent the VDP proposed wording for the
email, and portions of that wording were used in the final
communication.

Both the VDP and the Corren campaign were aware that the
email had value, and made efforts, including consultations with
counsel, to remain in compliance with the public financing
statute.  The Corren campaign offered two suggestions for
compliance: (1) pay the VDP for the value of the email, or (2)
avoid the related expenditure presumption by mentioning more than
six candidates.  ECF No. 2-2 at 26.[1]  The VDP informed the Corren
campaign that it would pursue the latter option.

The final version of the email stated in relevant part:

Many of you know I'm a strong supporter of Dean Corren

---

[1]  An expenditure made by a political party is presumed to be
"related" if it primarily benefits six or fewer candidates.  *Id.* §
2944(c)(1).

6

for Lt. Governor but maybe you don't know why.  Dean
has the skills and experience to support our Vermont
Democratic Party Platform and overcome some of the
greatest challenges we face.

. . .

I believe Dean would make an excellent Lt. Governor,
but to make this happen we all need to pitch in.  Here
are a few ways you can help.

1. **Come to a Rally!**  This weekend we are joining
Senator Bernie Sanders, Governor Peter Shumlin, Dean
and local candidates at four [Get Out The Vote] rallies
across the state. [The email went on to list four
rallies in Bristol, Proctor, Hinesburg, and St.
Albans.]

. . .

3.  **Tell Your Neighbors!**  We are working every day to
talk to voters in Vermont into getting to the polls on
Election Day.  Sign up to volunteer for a shift here.
For other ways to help, please email
volunteer@deancorren.com

I appreciate all the work you are doing on behalf of
our candidates around the state and look forward to
celebrating great victories with you on the 4th.  Now
get out and vote for Congressman Peter Welch, Governor
Peter Shumlin, Dean Corren for Lieutenant Governor, and
the rest of our amazing Democratic ticket!

ECF No. 1-1.

On October 30, 2014, the Attorney General's office notified

the Corren campaign and the VDP that the October 24, 2014 email

constituted an uncompensated contribution in violation of Vermont

campaign finance law.  Specifically, the Attorney General

contended that the email was a related campaign expenditure

because it was intentionally solicited and facilitated by the

campaign.  ECF No. 2-2 at 11.  The alleged value of the

contribution – representing the value of the email list – was $255.

After conducting an investigation, the Attorney General's office provided Corren with a draft of a civil enforcement pleading it was prepared to file in state court.  The state court action would seek $20,000 in fines and the return of the approximately $52,000 in public funds that the Corren campaign had in its accounts as of the date of the email.  Corren disputed the alleged violation, and alternatively offered to pay the $255 value of the email list.  That offer was reportedly rejected.  As of December 12, 2014, the Corren campaign had spent all of its campaign funds with the exception of $73.60, which was returned to the State.

On March 25, 2015, the Attorney General's office filed an enforcement action against Corren in Vermont Superior Court.  ECF No. 2-2 at 1-14.[2]  As the Attorney General had warned, the action alleged a related expenditure and sought $20,000 in fines as well as a refund of the $52,000 in public funds held by the Corren campaign as of October 24, 2014.

## Procedural History

**I.   Federal Court Filings**

On March 20, 2015, shortly before the State filed its

---

[2]  The Attorney General's office previously reached a settlement with the Vermont Democratic Party.

enforcement action, Corren brought suit in this Court challenging the constitutionality of various portions of Vermont's campaign finance law.  Corren also moved for preliminary injunctive relief, in part to prevent the State from prosecuting the enforcement action.

Attorney General Sorrell, as the sole Defendant at the time of the original Complaint, moved the Court to abstain from hearing the case in light of the state court enforcement proceeding.  When Corren amended his Complaint to add several additional Plaintiffs, the Attorney General again moved to dismiss, arguing both for abstention and that the newly-added Plaintiffs lacked standing.  After the Court held a hearing on the motions to dismiss, Plaintiffs filed their Second Amended Complaint, in part to supplement their factual allegations in response to the Court's questions about standing.  The Attorney General responded with a third motion to dismiss.

On December 8, 2015, the Court issued an Opinion and Order granting in part and denying in part the motion to dismiss the Second Amended Complaint, and denying the prior motions to dismiss as moot.  The Court held that it would abstain from hearing Corren's challenges to Vermont's campaign finance law insofar as those challenges related to the enforcement action, but would be able to address Corren's other, unrelated allegations.  The Court further held that the Plaintiffs had

standing to bring the bulk of their claims, some of which overlapped with Corren's initial allegations.

## II.  The Second Amended Complaint

The effective pleading before the Court remains the Second Amended Complaint.  Plaintiffs include Corren, the Vermont Progressive Party ("VPP"), Steven Hingtgen, Richard Kemp, and Marjorie Power.  Hingtgen, Kemp, and Power are each former Progressive Party candidates and past political contributors. David Zuckerman, a 2016 candidate for Lieutenant Governor, has been granted leave to intervene as a Plaintiff and has filed his own pleading.

The Second Amended Complaint currently contains three counts.[3]  Count I challenges the constitutionality of 17 V.S.A. § 2983(b)(1), which makes it unlawful for a publicly-funded candidate to solicit, accept, or expend campaign contributions or make expenditures aside from the public financing grant or the qualifying funds.  Plaintiffs contend that the statute effectively bars nearly all assistance from political parties, thereby violating the association rights of both the parties and

_____

[3]  Count IV sought injunctive relief from enforcement of the refund provision set forth at 17 V.S.A. § 2903(b).  The Vermont Legislature recently amended Section 2903(b).  *See* 2015 Vt. Acts & Resolves, No. 30.  The statute currently calls for the refund of "an amount equivalent to any contributions or expenditures that violate subdivision 2983(b)(1) of this chapter."  17 V.S.A. § 2903(b). Because Corren sought relief under the prior version of the law, the Court dismissed Count IV without prejudice.

the candidates.  Plaintiffs further allege that the bar runs afoul of the ruling in *Randall v. Sorrell*, 548 U.S. 230 (2006), which held that Vermont could not prohibit contributions of less than $400 to candidates for statewide office.  *Id.* at 264-65.

Plaintiffs also note that as of 2015, Vermont allows traditionally-funded candidates to receive unlimited contributions from political parties.  By limiting a publicly-funded candidate's spending to the amount of the public grant, Section 2983(b)(1) allegedly puts that candidate at a disadvantage when facing a well-financed opponent.  The solution, Plaintiffs argue, is a "rescue" provision that would allow publicly-funded candidates to raise additional private funds if necessary.

Count II attacks the constitutionality of the related expenditures provision, arguing that it violates the rights of association of both the publicly-funded candidates and their parties.  Count II also challenges the presumption that an expenditure benefitting six or fewer candidates is "related."

Count III claims that the related expenditures provision, as currently being enforced by the Attorney General, puts political parties and their supporters at risk of prosecution if they fail to report even exempted activities as contributions.  This threat of enforcement allegedly creates a chilling effect on the speech and associational rights of publicly-funded candidates, political

11

parties, and party members.  Count III further alleges that the
October 24, 2014 email from the VDP was not a campaign
contribution because (1) it was sent on a party computer, and (2)
it applied to an event at which three or more candidates were
present.  *See* 17 V.S.A. §§ 2901(4)(F), (L).

### III. Zuckerman's Complaint

Intervenor/Plaintiff David Zuckerman's pleading names both
the Attorney General and Secretary of State James Condos as
Defendants.  In Count I, Zuckerman challenges the rule forbidding
a publicly-financed candidate from announcing his candidacy or
expending more than $2,000 prior to February 15, 2016.  *See* 17
V.S.A. § 2983(a).  Zuckerman claims that this provision
constitutes a bar on his political speech, and puts him at a
"substantial practical disadvantage" when compared to
traditionally-financed candidates who are not so restricted.  ECF
No. 40 at 2.  Count II of Zuckerman's pleading largely echoes the
challenge to 17 V.S.A. § 2983(b)(1) (limiting contributions and
expenditures to the amount of the public grant and any qualifying
contributions) asserted in Count I of the Second Amended
Complaint.[4]

---

[4]  Although Zuckerman's pleading seeks both preliminary and
permanent injunctive relief, as well as a declaratory judgment, he has
not filed a preliminary injunction motion.  Plaintiffs incorporated
Zuckerman's memorandum in support of his motion to intervene into
their reply memorandum regarding the preliminary injunction motion.
ECF No. 48 at 2.  Nonetheless, the Court has not received a
preliminary injunction motion that includes Zuckerman as a movant.

<u>**Discussion**</u>

**I.   Legal Standards**

The Attorney General and the Secretary of State have moved
to dismiss both the Second Amended Complaint and Zuckerman's
pleading.  ECF No. 43-1 at 2 n.1.  Defendants submit their motion
to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  In deciding a
Rule 12(b)(6) motion to dismiss, the Court applies a
"plausibility standard," which is guided by "[t]wo working
principles."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(citing
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris
v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009).  First, although the
Court must accept all factual allegations as true, this tenet is
"inapplicable to legal conclusions;" thus, "[t]hreadbare recitals
of the elements of a cause of action supported by mere conclusory
statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Second,
only pleadings that state a "plausible claim for relief" can
survive a Rule 12(b)(6) motion to dismiss.  *Id.* at 679.
Determining whether a pleading does so is "a context-specific
task that requires the reviewing court to draw on its judicial
experience and common sense."  *Id.*

For any claims that survive the motion to dismiss, the Court
will apply the standards for preliminary injunctive relief.
Generally, to obtain a preliminary injunction a party must
demonstrate "'(1) irreparable harm in the absence of the

13

injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair grounds for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *MyWebGrocer, L.L.C. v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (quoting *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002)). However, where "the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme," as in this case, "the district court should not apply the less rigorous fair-ground-for-litigation standard" and should instead require a likelihood of success on the merits. *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995); *see Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).

## II.  Motion to Dismiss

A.   Guiding Principles

In *Buckley v. Valeo*, the Supreme Court ruled that public financing may be used "to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people."  424 U.S. 1, 92-93 (1976). The Supreme Court also noted that offering public money to political campaigns constitutes "a means of eliminating improper influence of large private contributions."  *Id.* at 96. Accordingly, public financing of political campaigns is a

14

recognized means of promoting legitimate governmental interests.

As discussed above, public financing in Vermont comes with certain restrictions. When designing a public financing scheme, a legislature may impose restrictions that "would normally be impermissible" under traditional constitutional standards. *Ognibene v. Parkes*, 671 F.3d 174, 193 (2d Cir. 2011). The scheme may not, however, completely disregard constitutional requirements. *See, e.g., Daggett v. Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445, 466 (1st Cir. 2000) ("Although public financing is not inherently unconstitutional, it may be so if it 'burdens the exercise of political speech' but is not 'narrowly tailored to serve a compelling state interest.'") (citing *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 657 (1990) (quoting *Buckley*, 424 U.S. at 44-45)). Indeed, "the goal of creating a viable public financing scheme can only be pursued in a manner consistent with the First Amendment." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2828 (2011) (hereinafter "*Arizona Free Enterprise*").

In construing Vermont's public financing statute, this Court is guided by some fundamental principles. First, when interpreting a statute that has yet to be adjudicated in the state courts, a federal court must "carefully . . . predict how the state's highest court would resolve" the issues before it.

15

*Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 78 (2d Cir. 1999) (internal quotation marks omitted); *see Plummer v. Lederle Laboratories*, 819 F.2d 349, 355 (2d Cir.), *cert. denied*, 484 U.S. 898 (1987) ("if there is no direct decision by the highest court of that state, the federal court should determine what it believes that state's highest court would find if the issue were before it."). Here, there is a concurrent proceeding in the state courts, but neither the lower court nor the Vermont Supreme Court has issued an opinion on the constitutional issues raised by the Plaintiffs.

Second, "where an otherwise acceptable construction of a statute would raise serious constitutional problems," the Court must "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of [the legislature]." *United States v. Magassouba*, 544 F.3d 387, 404 (2d Cir. 2008) (internal quotation marks omitted). This canon of construction is a "tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that [the legislature] did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005); *cf. United States v. Five Gambling Devices*, 346 U.S. 441, 448 (1953) ("The principle is old and deeply imbedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious

16

constitutional questions only if the statutory language leaves no reasonable alternative.").

Finally, the Court must look not only at the specific statutory language, but also at the design of the statute, its object, and the underlying policy. *See Crandon v. United States*, 494 U.S. 152, 158 (1990).

B.   Plaintiffs' Challenges

Plaintiffs raise a series of constitutional challenges, arguing that Vermont's restrictions on publicly-financed candidates unlawfully impinge upon the speech and association rights of those candidates and their supporters.  Their arguments focus in large part upon communications with political parties, as association with a political party has been deemed "a particularly important right." *Randall*, 548 U.S. at 256. Defendants contend that so long as candidates voluntarily choose public financing, there is no need to consider their constitutional rights. *See, e.g., Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552-53 (8th Cir. 1996); *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 39 (1st Cir. 1993).  Setting aside the question of voluntariness, the Court finds that Vermont's public financing system, broadly construed, does not impose unconstitutional limitations on speech and association rights.

i.   Contribution Limits

With respect to contribution limits, the Vermont scheme bars

17

private contributions to candidates who are receiving public funds.  The Supreme Court has consistently upheld contribution limits, and *Buckley* specifically concluded with regard to public financing that "laws providing financial assistance to the exercise of free speech . . . enhance [] First Amendment values." *Id.* at 93 n. 127.  Limits on private contributions go to the very purpose of public financing, and the Court finds that Vermont's system is constitutional in this regard.[5]

> ii.  Expenditure Limits

The statute also limits campaign expenditures.  Although such limits are often struck down, *see, e.g., Randall*, 548 U.S. at 246, public financing is the exception.  *See Buckley*, 424 U.S. at 57 n.65 (noting that Congress "may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations").  Plaintiffs nonetheless assert that Vermont's limits are unconstitutional because publicly-funded candidates cannot compete against well-funded opponents.  Their proposed solution is for the Court to rewrite the statute such that a publicly-financed candidate may raise funds beyond those allowed by statute "to the extent that a publicly financed

---

[5]  Although Plaintiffs challenge the limit on private contributions as violating *Randall's* declaration that a limit of $400 for political parties is unconstitutionally low, *Randall* did not address Vermont's "voluntary public financing system."  548 U.S. at 239.

candidate is being outraised or outspent by an opponent, and only to that extent."  ECF No. 56 at 4.

When public financing first became available in Vermont in 1997, state law limited spending by all political candidates. The Supreme Court later held that those universal expenditure limits were unconstitutional.  *See Randall*, 548 U.S. at 264-65. Limits on spending by publicly-funded candidates, however, survived the *Randall* decision.  Consequently, Plaintiffs now argue that without corresponding limits on traditionally-funded candidates, publicly-financed candidates run a substantial risk of being outspent.

Plaintiffs further contend that the danger of being outspent is greater in the aftermath of *Citizens United v. FEC*, 558 U.S. 310 (2010).  *Citizens United* struck down a statute that prevented corporations from making expenditures for electioneering communications.  558 U.S. at 372.  Plaintiffs argue that since only traditionally-funded candidates may benefit from such corporate spending, *Citizens United* will result in an even greater imbalance between those candidates and their publicly-funded opponents.

What the Plaintiffs are seeking is essentially a judicially-mandated leveling of the financial playing field.  It is well established, however, that a candidate has no right to a level playing field with respect to fundraising.  *See Arizona Free*

19

*Enterprise*, 131 S. Ct. at 2825-26.  In fact, legislative efforts
to provide equal financing to candidates have been invalidated as
unlawful restrictions on the opponent's speech.  *See id.*  As
Chief Justice Roberts explained in 2011,

> We have repeatedly rejected the argument that the
> government has a compelling state interest in "leveling
> the playing field" that can justify undue burdens on
> political speech.  *See, e.g., Citizens United*, 130 S.
> Ct. at 904-05.  In *Davis* [*v. Fed. Elec. Comm'n*], we
> stated that discriminatory contribution limits meant to
> "level electoral opportunities for candidates of
> different personal wealth" did not serve "a legitimate
> government objective," let alone a compelling one.  554
> U.S. [724,] 741 [(2008)] (internal quotation marks
> omitted).  And in *Buckley*, we held that limits on
> overall campaign expenditures could not be justified by
> a purported government "interest in equalizing the
> financial resources of candidates."  424 U.S. at 56;
> *see id.*, at 56-57.  After all, equalizing campaign
> resources "might serve not to equalize the
> opportunities of all candidates, but to handicap a
> candidate who lacked substantial name recognition or
> exposure of his views before the start of the
> campaign."  *Id.* at 57.
>
> . . .
>
> "Levelling the playing field" can sound like a good
> thing.  But in a democracy, campaigning for office is
> not a game.  It is a critically important form of
> speech.  The First Amendment embodies our choice as a
> Nation that, when it comes to such speech, the guiding
> principle is freedom – "the unfettered interchange of
> ideas" – not whatever the State may view as fair.
> *Buckley*, *supr*a, at 14 (internal quotation marks
> omitted).

*Id.*

Plaintiffs seek to distinguish *Arizona Free Enterprise* and
*Davis* by noting that the challenged provisions in those cases
triggered additional *public* funds, while the proposed rescue

20

provision here would allow for additional *private* funds.  In both situations, however, the Legislature would be making a state-sponsored effort toward level financing.  Furthermore, rewriting the statute as Plaintiffs request is beyond this Court's power, as the Court may only consider the constitutionality of each provision.  *See Virginia v. Am. Booksellers Ass'n*, *Inc.*, 484 U.S. 383, 397 (1988) ("we will not rewrite a state law to conform it to constitutional requirements").  Finally, such a revision to the statute would seriously erode the purpose of public financing by re-introducing the potentially-corrosive effects of private contributions.[6]

### iii. Related Expenditures

With respect to the constitutionality of the related expenditure provision, that question was settled in *Landell v. Sorrell*, 118 F. Supp. 2d 459, 492 (D. Vt. 2000), *aff'd* 382 F.3d 91, 146 (2d Cir. 2004), *rev'd on other grounds by Randall*, 548 U.S. at 262-63.  There, plaintiffs argued that the phrase "facilitated" was vague, and that political parties and political action committees ("PACs") "should have greater abilities to engage in coordinated expenditures with candidates."  382 F.3d at

---

[6]  Because the Court cannot rewrite the statute to place limits on additional fundraising, striking down Section 2983(b)(1) would allow publicly-financed candidates to raise private funds without limitation.  In that event, all candidates would likely apply for public financing, as the public funds would enhance their campaign accounts without any limitation on private fundraising.  That result would render public financing meaningless, since public funds would be just another means of funding a traditional campaign.

145.  Plaintiffs also challenged the rebuttable presumption that an expenditure is related if six or fewer candidates receive the benefit.

Affirming this Court's ruling, the Second Circuit read the statute narrowly and found no ambiguity; rejected the claim that parties and PACs should be treated differently; and upheld the rebuttable presumption given that an accused party could demonstrate that "the expenditure was truly independent from the candidate it supported."  *Id.* at 145-46.  The Supreme Court's reversal on appeal did not reach those issues.  In his dissent, however, Justice Souter did remark that with respect to the rebuttable presumption, "[r]equiring the party in possession of the pertinent facts to come forward with them" does not "rise to the level of a constitutionally offensive encumbrance."  *Id.* at 290.

The Court is nonetheless concerned that the term "contribution" in the related expenditures provision, improperly construed, might nullify the exemptions set forth in 17 V.S.A. § 2901(4).  Those exemptions were added, in part, so that political parties could engage in their traditional role of actively supporting candidates, and to protect the constitutional right to associate in a political party.  If that support is considered a "related campaign expenditure," and in turn a forbidden contribution, political parties and other supporters will likely

be foreclosed from providing fundamental assistance to candidates who have pledged to receive, and expend, only public funds.

In *Landell*, the Second Circuit construed the related expenditure provision narrowly, citing principles of constitutional avoidance.  382 F.3d at 145-46 (citing WILLIAM ESKRIDGE, LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY 873-89 (3d ed. 2001)).  Here too, the related expenditure provision – and ultimately the bar on soliciting contributions set forth in Section 2983(b)(1) – must be read narrowly in order to address any potential statutory conflict and avoid the potential constitutional issue.  To bring the statutory provisions into harmony, and as apparently conceded by the Defendants in their briefing, the contribution exemptions in Section 2901(4) must apply throughout the statute.  Accordingly, a related expenditure is considered a contribution to a candidate *unless* the expenditure is an activity that is specifically exempted under 17 V.S.A. § 2901(4).  If an exemption applies, the related expenditures provision does not apply, there is no reporting requirement, and a publicly-funded candidate will not be deemed to have violated Section 2983(b)(1).

In their latest filing, Defendants allow that political parties may provide publicly-financed candidates with robust support, including get out the vote efforts, messages of support for candidates, and mobilization of volunteers.  ECF No. 56-57.

Construing the statute as allowing these sorts of activities is
consistent with the legislative intent behind Section 2901(4),
and protects the right to associate as so aptly highlighted by
the Legislature.  *See* Vt. Act 90, S.82, Sec. 1, ¶ 10 ("these
exemptions help protect the right to associate in a political
party").  And given this interpretation of the statute, the Court
finds no constitutional problem with the related expenditures
provision as it applies to publicly-funded candidates.

iv.  Declaration Date

Plaintiffs, and Zuckerman in particular, further challenge
the declaration date for public financing.  In the 2016 election
cycle, candidates may not declare their desire for public
financing prior to February 15, 2016.  After February 15,
candidates may solicit $50 donations in an effort to meet the
minimum of $17,500 during the campaign finance qualification
period.  17 V.S.A. §§ 2981(4), 2984(a)(2).  Formal affidavits to
apply for public financing are due on May 26, 2016.  *Id.* § 2356.

Defendants submit that the window of time between February
and May is intended to be narrow, so that only viable candidates
who can raise qualifying funds in such a short period of time
will be allowed access to public financing.  As stated in
*Buckley*, a legislature's "interest in not funding hopeless
candidates with large sums of public money necessarily justifies
the withholding of public assistance from candidates without

24

significant public support."   424 U.S. at 96.   Such support may
be demonstrated by raising money during the time period, and in
the amounts, dictated by the Legislature.   The Court therefore
finds that this provision is constitutionally sound.

     C.   Ruling on the Motion to Dismiss

     Accordingly, the Court finds no constitutional infirmity in
Vermont's public financing scheme.   The Legislature clearly
intended to allow for political parties and other supporters to
be actively involved in publicly-financed campaigns, and drafted
a law that supports the constitutional rights of those various
actors.   The few restrictions in the law are plainly reasonable,
and further First Amendment interests.

     In reaching these conclusions, the Court construes the
public financing law such that the legislative exceptions to the
term "contribution" apply throughout the statute.   If the state
courts read the law in a manner that is inconsistent with this
Court's view, questions about the statute's constitutionality may
again become ripe.   The motion to dismiss is therefore **granted**,
and the case is **dismissed** without prejudice to renewal if
Plaintiffs require further federal court review.

**II.   Preliminary Injunction Motion**

     Because the Court, based upon its own interpretation of the
Vermont statute, finds no constitutional flaw in the challenged
provisions, it correspondingly concludes that Plaintiffs'

preliminary injunction motion fails to show a likelihood of success on the merits. *Able*, 44 F.3d at 131. That motion is therefore **denied** without prejudice.

## III. Conclusion

Plaintiffs contend that Vermont's campaign finance law, as enforced by the Attorney General, violates the constitutional rights of publicly-financed candidates and their supporters. Testimony before the Court revealed confusion on all sides as to what the law allows, and whether political parties in particular can play a role in publicly-financed campaigns.

Having reviewed the parties' submissions and the relevant statutory provisions, the Court now finds that Vermont's public financing system allows candidates to communicate freely with, and receive meaningful assistance from, their supporters. Political parties in particular may provide publicly-financed candidates with office space, voter lists, training sessions, and other forms of traditional party support without violating any statutory restrictions. The Vermont Legislature specifically carved out those activities with constitutional principles in mind, and the Court finds no basis at this time for striking down the law.

Plaintiffs also submit that they are being outspent by traditionally-financed opponents. Because there is no constitutional right to a level playing field in campaign

financing, the Court cannot grant relief on that issue.  If the public grants do not provide enough funds for viable campaigns, it is for the Legislature and not this Court to make the necessary adjustments.  As to all other issues raised by the Plaintiffs, the Court concludes that the challenged provisions are constitutional.

Accordingly, Plaintiffs' motion for preliminary injunctive relief is **denied**, and the motion to dismiss is **granted**.  This case is **dismissed** without prejudice to re-filing in the event that the state courts offer an interpretation of the statute that is inconsistent with this Opinion and Order.


Dated at Burlington, in the District of Vermont, this 9th day of March, 2016.


/s/ William K. Sessions III
William K. Sessions III
District Court Judge

27